UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: JUL 3 1 2013

------------------------------------------------------------X

ROBERT C. ADAMIK,

                          Plaintiff,

           -v-

COMMISSIONER OF SOCIAL SECURITY,

                      Defendant.

------------------------------------------------------------X

12 Civ. 3593 (KBF)

OPINION & ORDER

KATHERINE B. FORREST, District Judge:

      Plaintiff Robert C. Adamik seeks review of the Social Security

Administration's ("SSA") 1996 denial of his claim for Social Security Disability

("SSD") benefits for the period January 1996 through December 31, 1999.[1]  Plaintiff

claims SSD benefits based upon cervical and lumbar spine conditions.  This matter

comes before this Court for the third time; two prior appeals resulted in orders of

remand to the SSA.

      Now before the Court are plaintiff's motion for judgment on the pleadings

filed November 15, 2012, (ECF No. 12), and the cross-motion filed by defendant

---

[1] In order to retain eligibility for benefits, Social Security Disability claimants must earn at least a
minimum threshold amount of Social Security wages within a set period preceding their claim. See
42 U.S.C. § 423(a)(1)(A), (c)(1); 20 C.F.R. §§ 404.101(a), 404.110–404.133; Shaw v. Chater, 221 F.3d
126, 131 (2d Cir. 2000). Adamik's date of last insured status, i.e., the date on which he was last
eligible for disability insurance benefits, was December 31, 1999. Thus, he is not eligible to receive
benefits for any disability beginning after that date. 20 C.F.R. §§ 404.130, 404.315; Arnone v. Bowen,
882 F.2d 34, 38 (2d Cir. 1989).

Commissioner of Social Security ("Commissioner") filed January 18, 2013 (ECF No. 15).

For the reasons set forth below, plaintiff's motion is DENIED and defendant's cross-motion is GRANTED.

## I.   PROCEDURAL AND FACTUAL BACKGROUND

### A.  Factual Background

The record in this case is voluminous.  In the 17 years this claim has been pending, Adamik was evaluated or treated by at least ten doctors and testified at four SSA hearings.  The Court recites only those facts relevant to its review here; a more thorough summary of Adamik's medical history can be found in Magistrate Judge Pitman's Report and Recommendation (R. at 155-57), in the parties' briefing (ECF Nos. 13, 16), and in the extensive administrative record.

#### 1.  Adamik's Spinal Conditions

In early 1996, Adamik began to suffer from a variety of neck and back conditions that he claims have prevented him from working.  Prior to the onset of these ailments, Adamik attained a high school diploma, and had worked for eight years stocking shelves in a grocery store, for three years as an employee for a floor refinishing business, and then for seven years as a self-employed floor sander. (Admin R. ("R.") at 167, 540, 556, ECF No. 6.) He claims that chest pains, bilateral carpel tunnel syndrome, and numerous pinched spinal nerves in January 1996, forced him to abandon his sanding business. (R. at 163.)

These neck issues persisted, though they were substantially alleviated by a surgical procedure in February 1998. At the same time, however, Adamik began to experience pain in his lower back, which radiated around his waist. (R. at 559-60). Adamik claims that this pain intensified from late 1998 into early 1999. Thus, Adamik asserts that, as of December 31, 1999 – the last date he was insured under the Social Security Act – he suffered from two distinct conditions, lumbar pain and cervical pain.

2. Adamik's Testimony

Adamik's testimony as regards his symptoms has evolved. In October 1997, Adamik testified the pain first originated in his left shoulder and radiated to his left hand. (R. at 543.) He stated that the pain was continuous, but ranged from "numbness and tingling" to "a sharp stabbing pain." (R. at 543-44.) He claimed that these symptoms prevented him from sitting for more than an hour at a time, and from standing for more than 45 minutes at a time before needing to move. He could only alleviate the pain by lying down (R. at 544-45) and could not lift more than five pounds (R. at 545).

At a subsequent hearing in 1999, Adamik testified that, in addition to the pain originating in his neck, he also experienced pain in his lower back that radiated around his waist. (R. at 559-60.) Later in the proceeding, he acknowledged that the February 1998 neck fusion procedure had eliminated the most serious of these symptoms, but stated that this neck pain still "ranges about a six." (R. at 564.)

He testified that he could lift the equivalent of a half-gallon of milk (R. at 568) and could only sit or stand in half-hour increments. (R. at 567-68.)

At a third hearing in December 2005, Adamik testified that his lower back condition became "[v]ery troublesome" between late 1998 and early 1999. (R. at 581-82.) He testified that he could only sit in a normal chair for periods of two hours before experiencing lower back pain. (R. at 581-82.) He indicated that he could descend the three flights of stairs outside his apartment and walk two blocks, as well as go fly fishing nearby for 30 minutes at a time. (R. at 582-83.) However, he claimed that between late 1999 and 2000 his lower back pain began radiating to his legs, preventing him from going fishing more than once or twice a month. (R. at 587, 594.)

At the December 2005 hearing, Adamik's testimony clearly differed from his prior testimony. At that hearing he testified that he only experienced occasional pain in his neck, that the February 2008 operation had made a difference, and that the pain after that point was focused in his lower back. (R. at 588.) When asked why he did not pursue sedentary work during the "best period of time" between the surgery and the worsening of his lower back pain in early 1999, Adamik stated that (1) he lacked the proper training, and (2) the pain from sitting for long periods of time prevented him from maintaining concentration. (R. at 597-98.)

B. Procedural Background

Adamik first applied for disability benefits on March 29, 1996. (R. at 155-57.) The application was denied on June 6, 1996. (R. at 120-22.) Administrative Law

Judge ("ALJ") Jerome Feiner held a review hearing ("Hearing I") on October 7, 1997. (R. at 531-51.) ALJ Feiner found Adamik not disabled, but the Appeals Council remanded the case for further proceedings on November 3, 1998. (R. at 130-38.)

ALJ Frank Borda held a second hearing on October 5, 1999 ("Hearing II"). (R. at 93-117, 552-74.) The ALJ and Appeals Council denied Adamik's requests for review. (R. at 55-64.) Adamik then filed a civil action in this court, Adamik v. Barnhart, 02 Civ. 6908 (RMB)(HBP)(S.D.N.Y. 2000); the Commissioner agreed to a voluntary remand of that action for further record development. (R. at 391-92.)

ALJ Dennis Katz held a third hearing on December 6, 2005 ("Hearing III"), after which he denied Adamik's claim. (R. at 278-90, 365-68, 575-603.) After the Appeals Council denied review, Adamik once again appealed to this Court. See Adamik v. Astrue, No. 07 Civ. 10278 (JSR)(HBP)(S.D.N.Y. 2009). Magistrate Judge Henry B. Pitman issued an exhaustive Report and Recommendation on August 3, 2009, recommending that the claim be remanded for further proceedings.[2] Adamik v. Astrue, No. 07 CIV 10283 (JSR)(HBP), 2009 WL 6337910 (S.D.N.Y. Aug. 3, 2009) report and recommendation adopted, 07 CIV. 10283 (JSR), 2010 WL 1428121 (S.D.N.Y. Apr. 8, 2010). District Judge Jed Rakoff adopted the Report and Recommendation on April 6, 2010. Id.

---

[2] Judge Pitman found four grounds for remand: (1) that ALJ Katz had failed to consider the worsening of Adamik's lower back condition, and had not adequately developed the record on this point; (2) that he had erred in not adequately considering the retroactive applicability of a report from Adamik's treating physician, Dr. Francis Imbarrato; (3) that the ALJ had misstated the conclusion of treating physician Dr. Michael Robinson as to Adamik's ability to sit for long periods of time; and (4) that the ALJ had failed to provide reasons for rejecting Adamik's testimony regarding his own symptoms and capabilities. See generally Adamik, No. 07 CIV 10283, 2009 WL 6337910.

Following remand of the claim by the Appeals Council, a fourth hearing was held, again before ALJ Katz, on October 20, 2010 ("Hearing IV") and Katz again found Adamik not disabled.  (R. at 617-39, 905-11.)

This action was filed on May 7, 2012.  Adamik moved for judgment on the pleadings on November 15, 2012.  The Commissioner opposed plaintiff's motion and cross-moved on January 25, 2013.  Adamik did not file a reply brief.

## II. DISCUSSION

### A. Standard of Review

Decisions of the Commissioner are subject to limited judicial review. The Court may only consider whether the Commissioner has applied the correct legal standard and whether his findings of fact are supported by substantial evidence. When these two conditions are met, the Commissioner's decision is final. 42 U.S.C. § 405(g); Burgess v. Astrue, 537 F.3d 117, 127-28 (2d Cir. 2008); Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002).

With regard to the first inquiry, the Second Circuit has cautioned that "[w]here an error of law has been made that might have affected the disposition of the case, this [C]ourt cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ." Townley v. Heckler, 748 F.2d 109, 112 (2d Cir.1984) (internal quotation marks omitted).

If no such errors have been made, however, the Commissioner's decision must be upheld so long as it is supported by substantial evidence in the record as a whole.

Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (internal quotation marks omitted). The Court's role is not to make a de novo determination of disability. See Veino, 312 F.3d at 586 ("Where the Commissioner's decision rests on adequate findings supported by evidence having rational probative force, we will not substitute our judgment for that of the Commissioner."); Beauvoir v. Chater, 104 F.3d 1432, 1433 (2d Cir.1997). So long as substantial evidence supports the Commissioner's decision, the Court will not overturn it even where the record also contains substantial evidence to the contrary. See Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder."); see also DeChirico v. Callahan, 134 F.3d 1177, 1182–83 (2d Cir. 1998) (affirming the ALJ's decision where substantial evidence supported both sides). Indeed, "[t]he substantial evidence standard means once an ALJ finds facts, [the Court] can reject those facts only if a reasonable factfinder would have to conclude otherwise." Brault v. Social Security Admin. Commissioner, 683 F.3d 443, 448 (2d Cir. 2012) (internal quotation marks omitted; emphasis in original).

B. Analysis

The ultimate issue here is whether ALJ Katz erred in finding that Adamik possessed the residual functional capacity ("RFC") to engage in sedentary work from the onset of his back and neck conditions in January 1996 through the end of his insured status on December 31, 1999.

Adamik argues that ALJ Katz erred in his assessment because he (1) did not support his RFC conclusion with substantial evidence, (2) improperly discounted the medical evidence supportive of Adamik's claim, and (3) failed to properly credit Adamik's own testimony about the intensity and nature of his symptoms. The Court finds no such errors.

a.   Substantial Evidence for the RFC Determination

As an initial matter, Adamik argues that the ALJ's RFC determination was unsupported by substantial evidence. The Court disagrees.

As defined by the Social Security Regulations, the ability to engage in sedentary work requires that a claimant be able to remain in a seated position for approximately six hours of an eight-hour workday. 20 C.F.R. § 404.1567(a). Social Security Ruling ("SSR") 96-9P clarifies, however, that this does not mean that a claimant must be able to sit continuously for six hours. Rather, the regulations merely require ability to sit for a total period of six hours over the course of the workday, broken up into intervals of approximately two hours each. SSR 96-9P, 1996 WL 374185, at *6; see also Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2006)("The regulations do not mandate the presumption that all sedentary jobs in the United States require the worker to sit without moving for six hours, trapped like a seat-belted passenger in the center seat on a transcontinental flight.").

The ALJ concluded that Adamik could perform sedentary work on the basis of findings that Adamik could sit for seven hours and stand/walk for a total of six hours during the course of an eight-hour workday, that he was able to lift/carry

objects weighing 10 pounds on a sustained basis, and that he had no restrictions on the use of his right (dominant) hand. (R. at 625.) He came to these conclusions after determining that (1) Adamik suffered from a cervical spine condition, which was initially relatively minor; (2) that while this condition became more severe in the latter half of 1997, it was significantly improved by surgery in February 1998; and (3) that although Adamik began experiencing lower back pain around this time, it did not rise to a disabling level, if ever, until after Adamik's eligibility expired.

Medical evidence from Adamik's treating physicians in 1996 supports the ALJ's conclusion that Adamik's cervical spine condition was at first minor. For example, Adamik was treated by Dr. Peter Nagy from January through April 1996, who found that while an x-ray suggested discogenic disease, Adamik was capable of working full-time with retraining (R. at 189-208, 270-71, 288-314.) Similarly, in treating Adamik from March through August 1996, (R. 25, 248-52, 267-69, 310-13, 315, 354-56), Dr. Sue de Lanerolle, a neurologist, found that Adamik had a straight cervical spine, full range of motion, no significant paracervical spasm, and normal sensation and reflexes. (R. at 251.)

The opinions of Adamik's consulting physicians comported with those of the treating physicians. Dr. J. Wright Berry found in May 1996 that, while Adamik could not engage in work involving heavy physical exertion, he did exhibit normal gait and agility, with no limitation in range of motion. (R. at 253-56.) Dr. S. Gowd completed a residual capacity assessment for state disability benefits purposes that same month, finding that Adamik could sit, stand and walk for six hours in an

eight-hour workday. (R. at 259-66.) EMG testing in August 1996 showed no lumbar radiculopathy or neuropathy. (R. at 354-55.)

Further, while the medical evidence suggests that Adamik's condition worsened in 1997, there is substantial evidence to support the ALJ's determination that the deterioration occurred in the latter part of that year, and was rapidly and significantly remedied by surgery in February 1998. For instance, Dr. Francis Imbarrato first saw Adamik on January 28, 1997, diagnosing him with cervical disc disease and herniated discs but made no notation regarding Adamik's mobility. (R. at 349.) Later that year, Imbarrato indicated that Adamik could now only sit for up to two hours and stand/walk for a total of three hours in an eight-hour workday. (R. at 316-17.) He also concluded, in relevant part, that Adamik "is disabled and unable to work." (R. at 351.)

However, Adamik's condition improved following cervical spine surgery on February 9, 1998. Following the surgery, his surgeon, Dr. Deborah Benzil, reported that Adamik now had "minimal neck discomfort," and "feels dramatically better than he did preoperatively." (R. at 14-15.) She reported similarly positive results in March and June, noting that while Adamik had some stiffness in his neck and shoulder, he had no radicular pain, had excellent range of motion, and possessed full strength in his upper and lower extremities. (R. at 12-13, 358.) While she found that Adamik was "no longer eligible for heavy manual labor," she encouraged him to pursue retraining. (R. at 12.) These conclusions were echoed by Dr. Imbarrato in June 1998, who concluded that "overall, [Adamik] has done well since his surgery

10

and has made a good recovery." (R. at 12.) Adamik's improved condition was further evidenced in the July 1998 report of neurologist Dr. Alexander Alperovich, which found that, despite symptoms of radicular pain, Adamik could sit/stand/walk for eight hours in an eight-hour workday. (R. at 339.)

Adamik claims that his lower back pain began to worsen from late 1998 to early 1999, but there is substantial evidence to support the ALJ's finding that it did not preclude him from engaging in sedentary work. Dr. Imbarrato's notes dated February 17, 1998 report that Adamik complained of lower back pain, but that this pain did not radiate to his buttocks or legs. (R. at 869.) An MRI of Adamik's lumbar spine on August 31, 1998 revealed degenerated, bulging discs, but no evidence of herniation. (R. at 351.) On September 1, 1999, Adamik was again seen by Dr. Imbarrato and reported intermittent and chronic pain, that he could not sit longer than 30 minutes without changing position, and that he experienced some radiating pain in his left leg and shoulder. (R. at 868.) Dr. Imbarrato recommended that Adamik receive vocational rehabilitation and training. (R. at 345.) Thus, even as of this date, Dr. Imbarrato still believed Adamik to be a candidate for vocational training.

Indeed, ALJ Katz also noted that the objective medical evidence failed to show substantial structural deficits for the period of time from 1998 to 1999 when Adamik's lower back was allegedly significantly worsening. Rather, the record shows that throughout the relevant period, doctors examining Adamik repeatedly either stated he was capable of sitting for at least six hours in an eight-hour work

11

day,[3] or opined that he should pursue vocational training.[4] See Miller v. Astrue, 538

F. Supp. 2d 641, 650 (S.D.N.Y. 2008) (citing to doctor's analysis that claimant was a

candidate for vocational training as evidence he did not consider claimant precluded

from all work).  Further, Adamik did not require medication beyond routine pain

medications.  (R. at 630.)

The ALJ's determination that Adamik retained the RFC to perform

sedentary work was thus supported by substantial evidence.

### b. Weight Assigned to Medical Opinions

Aside from challenging the evidentiary support, Adamik also argues that the

ALJ committed legal error by failing to assign the proper weight to the opinion of

his treating physicians. The Court disagrees.

Under the Social Security Regulations, the "treating physician rule" provides

that "the opinion of a claimant's treating physician as to the nature and severity of

the impairment is given controlling weight so long as it is well-supported by

medically acceptable clinical and laboratory diagnostic techniques and is not

inconsistent with the other substantial evidence in the case record." Burgess, 537

F.3d at 128 (internal quotations omitted); 20 C.F.R. § 404.1527(c)(2).  This rule,

however, does not require the ALJ to give the treating physician's opinion

---

[3] Dr. Gowd in 1996 considered him capable of sitting six hours in an eight-hour workday (R. at 260); Dr. Alperovich in 1998 considered him capable of sitting for eight hours and walking for eight hours in an eight-hour workday (R. at 339.)

[4] Dr. Nagy stated in 1996 that Adamik was capable of working full-time if retrained (R. at 297); Dr. Benzil in 1998 encouraged Adamik to pursue retraining (R. at 12); Dr. Imbarrato considered him a candidate for vocational training in 1997 (R. at 349) and in 1999 (R. at 868, 345).  In 2000, Dr. Imbarrato noted that Adamik was not pursuing vocational training on the advice of his attorneys. (R. at 868.)

controlling weight when it is "contradicted by other substantial evidence in the record." Veino, 312 F.3d at 588.

Where such conflicts exist, the regulations require the ALJ to consider six factors: (1) the length of treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) the degree to which the opinion is supported by the relevant evidence; (4) the consistency of the opinion with the record as a whole; (5) whether the treating physician is a specialist in the relevant area; and (6) other factors tending to support or contradict the opinion. 20 C.F.R. § 404.1527(c)(2)-(6). The ALJ must "comprehensively set forth his reasons for the weight assigned." Burgess, 537 F.3d at 129; see also 20 C.F.R. § 404.1527(c)(2).

Here, the ALJ properly considered the medical opinions of all four of the treating physicians Adamik identified as supporting his claims.

### i. Dr. Imbarrato

Dr. Imbarrato, a family doctor, treated Adamik from January 1997 through at least June 2004. (R. at 33-40, 316-22, 345-53, 474-75, 860-69.) The ALJ properly discounted Dr. Imbarrato's conclusions. It is true that in October 1997, Dr. Imbarrato stated that Adamik could sit for only two hours and stand/walk for three hours in an eight-hour workday. (R. at 316.) A note bearing the same date concludes that Adamik "is disabled and unable to work." (R. at 351.) However, ALJ Katz did not give controlling weight to this opinion because he found that related to a short-term exacerbation of pain rather than any persisting symptoms. He

13

grounded this analysis primarily in the fact that the opinion describes symptoms worse than those in Dr. Imbarrato's prior assessments, and in the fact that Adamik's condition improved markedly following the surgery he underwent soon thereafter. This improvement was manifested in a number of sources: the notes of Adamik's surgeon, Dr. Benzil; Dr. Imbarrato's March 31, 1998 notes; Dr. Imbarrato's June 2, 1998 recommendation of vocational training; Adamik's Hearing II testimony; and the July 23, 1998 report from Dr. Alperovich (R. at 632-34). This reasoning was further bolstered by the fact that Dr. Benzil is a specialist in spinal issues, while Dr. Imbarrato is not. (Id.)

The ALJ also properly discounted Dr. Imbarrato's October 1999 assessment. This report indicated the presence of lower back pain with radiculopathy through the left leg, frequent cervical spine pain, and an ability to sit for 30-60 minutes at a time. It also notes that Dr. Imbarrato had discussed the possibility of vocational training with Adamik. The ALJ found that this assessment was based largely on Adamik's self-reporting, and that it was consistent with the ability to perform sedentary work. (R. at 634-35.)

Adamik contests this characterization, citing to SSR 83-12, 1983 WL 31253. This ruling provides that individuals who can sit for a time, but must then stand or walk for a period before returning to sitting are not capable of performing sedentary work. It goes on to note, however, that individuals who can satisfy the need to alternate between standing and sitting by doing so at breaks are not precluded from such jobs. See also SSR 96-9P, 1996 WL 374185, at *6 (providing that the ability to

14

sit for two hours at a time is sufficient for the ability to perform sedentary work). As noted above, however, numerous doctors throughout the relevant period found Adamik capable of sitting for six hours in an eight-hour work day.  In the face of this evidence, it was reasonable for the ALJ to discount the doctor's notation of the amount of time Adamik reported being able to sit continuously.

Finally, the ALJ properly discounted a November 2000 multiple-choice questionnaire in which Dr. Imbarrato stated that, as of May 1996, Adamik could sit for one hour and stand/walk for one hour in an eight-hour workday.  As May 1996 is eight months prior to Adamik's first consultation with Dr. Imbarrato, the ALJ properly discounted it as not based on the doctor's personal knowledge.  (R. at 635-36.)  In addition, its conclusion is at odds with Dr. Imbarrato's own assessments (and those of the other physicians), which found Adamik could sit and stand for longer periods.  See also Halloran, 362 F.3d at 31 (noting that reports given "on a standardized, multiple-choice" form are only "marginally useful for purposes of creating a meaningful and reviewable factual record").  Adamik himself admitted in his Hearing II testimony that, at least for a period of time following surgery, he was capable of sitting for two hours straight – well more than the Imbarrato questionnaire indicated.

    ii.   Dr. Michael Robinson

Adamik also alleges error in ALJ Katz's treatment of Dr. Michael Robinson's 2005 report.  This opinion, given in a check-off form, stated inter alia that Adamik could lift up to 20 pounds, and that he could stand/walk for at least two hours and

sit for less than six hours in an eight-hour workday. The ALJ discounted this opinion because it was issued after the date of last insured status, and gave no indication that it was intended to apply retroactively.

Adamik posits that this reasoning was improper, arguing (1) that Dr. Robinson's opinions were consistent with those of Dr. Imbarrato, and (2) that the absence of any dramatic decline in his symptoms suggests that Dr. Robinson's opinion can be fairly viewed as applying retrospectively. Both arguments fail.

The record indicates Adamik's condition worsened after he was no longer eligible for SSDI benefits, so the ALJ was not wrong to discount medical opinions based partially upon Adamik's post-eligibility conditions. In addition, as analyzed above, the ALJ properly discounted the Imbarrato report – its mere consistency with the Robinson report is neither here nor there.

### iii.  Drs. Alperovich and Appel

Finally, Adamik suggests that the ALJ should have credited the opinions of neurologist Dr. Alperovich and orthopedic surgeon, Dr. Appel.

The citation to Dr. Alperovich's report is puzzling. After evaluating Adamik on July 23, 1998, Dr. Aplerovich did find that Adamik's injury interfered with his ability to perform tasks including prolonged sitting and standing. (R. at 344.) However, he simultaneously opined that Adamik was capable of sitting for the full eight hours in the course of an eight-hour workday (R. at 339), a finding diametrically opposed to the more dire assessments by Dr. Imbarrato and Dr.

Robinson made regarding Adamik's condition after his period of benefits eligibility had expired.

The ALJ did not err in discounting the opinion of Dr. Appel either. Appel examined Adamik only on August 8, 2000. He completed a check-off form indicating, inter alia, that Adamik could sit for zero to one hours and stand/walk for zero to one hours in an eight-hour workday. (R. at 47-48.) The ALJ discounted the report because it was written after the insured period ended, was based on a selective review of the relevant medical records, and was provided for purposes of litigation, rather than for purposes of treatment. In addition, Dr. Appel based his opinion only upon a single examination and reported his results on a check-off form rather than in narrative format. Finally, while Dr. Appel is a specialist, his opinion stands in contrast to that of fellow specialist, Dr. Benzil, who was more extensively involved in Adamik's treatment during the relevant period. These facts further support the ALJ's decision to discount Dr. Appel's testimony.

Viewing the record as a whole, then, ALJ Katz did not err in assigning weight to the relevant medical opinions.

c. Adamik's Credibility

Finally, Adamik challenges the ALJ's determination of Adamik's credibility. The Second Circuit has held that "an ALJ must assess subjective evidence [such as the claimant's testimony regarding pain] in light of objective medical facts and diagnoses." Williams on Behalf of Williams v. Bowen, 859 F.2d 255, 261 (2d Cir. 1988). The ALJ may not reject a claimant's characterization of his or her symptoms

solely because that characterization is not supported by the objective medical evidence. 20 C.F.R. 404.1529(c)(2). In addition to the objective medical evidence, the ALJ must also consider relevant factors including the individual's daily activities; the location, duration, frequency, and intensity of the claimant's symptoms; factors that precipitate or aggravate the symptoms; and the measures taken to alleviate symptoms, including any treatment received (in the form of medication or otherwise). Id.

Adamik claims that ALJ Katz failed to properly credit his testimony at each of the first three hearings that he was unable to sit for more than one hour before needing to change positions. (R. at 544-45, 567, 572, 581-82.) He argues that the ALJ (1) applied the wrong legal standard; (2) improperly considered Adamik's pecuniary stake in the outcome of the proceeding; and (3) failed to grant to the deference warranted by Adamik's work history.

As to the legal standard, Adamik argues that the ALJ erred by comparing Adamik's testimony to the ALJ's assessment of Adamik's residual functional capacity, rather than solely against the medical evidence. The Court disagrees with this interpretation of the record. The ALJ specifically concluded that, "[t]he objective medical evidence does not demonstrate such objective deficits that would justify the claimant's overall testimony concerning his near-total debilitation." (R. at 637 (emphasis in original).) The sentence includes a footnote citing to two MRIs of Adamik's spine and December 1998 notes by Dr. Imbarrato. (Id.) The statement

and accompanying footnote indicate that the ALJ appropriately reached a conclusion on the basis of the relevant medical records.

In addition, if the ALJ erred by asserting he was "not required to give conclusive effect to the testimony of a litigant who, obviously, has a significant financial interest in the outcome of the case," such error was harmless. (R. at 637.) While this Court agrees with analysis of the Court in Vinnedge v. Astrue, 2010 WL 457611, at *2 (C.D. Cal. Feb. 4, 2010), that skepticism based on pecuniary stake alone would be improper, the ALJ here cited several other, clearly legitimate reasons for discounting Adamik's testimony.

Finally, Adamik's consistent prior work history did not require the ALJ to conclude that he became unable to work once his asserted injuries occurred. Plaintiff is correct that "[a] claimant with a good work record is entitled to substantial credibility when claiming an inability to work because of a disability." Rivera v. Schweiker, 717 F.2d 719, 725 (2d Cir. 1983), citing Singletary v. Secretary of Health, Education and Welfare, 623 F.2d 217, 219 (2d Cir.1980). This consideration is not dispositive, however, and an ALJ may discount a claimant's credibility in the face of a positive work history when that conclusion is supported by other substantial evidence in the record. Stanton v. Astrue, 370 F. App'x 231, 234 (2d Cir. 2010), citing Schaal v. Apfel, 134 F.3d 496, 502 (2d Cir.1998).  Where such evidence exists, the ALJ's failure to explicitly reference the claimant's work history does not in itself warrant reversal. Id.

Here, the ALJ thoroughly examined the evidence in the record that demonstrated Adamik was not disabled for the purposes of the Act. Specifically, he weighed the medical evidence and examined portions of Adamik's testimony that contradicted his more dire characterizations of his symptoms. For instance, the ALJ noted that at Hearing I, Adamik testified that he could travel in a car for up to two and one-half hours at a time. (R. at 637.) Similarly, at Hearing II, Adamik testified that from 1998 to early 1999 (the period in which he claimed his lower back pain became a serious impediment) he was capable of sitting in a normal chair for two hours. At the same hearing, in response to questioning by his attorney about why he was unable to perform a sedentary job, the only two reasons he gave were a lack of training and difficulties in concentration resulting from his pain. As ALJ Katz noted, this testimony was contradicted by his statement at another point in Hearing II that as of October 5, 1999, his concentration was "good." (R. at 638 n.26.)

When viewed as a whole and analyzed in accordance with the standards set out in the regulations, ALJ Katz both applied the proper legal standard and supported his decision to discredit Adamik's testimony with substantial evidence.

## CONCLUSION

Therefore, and for the reasons stated above, the plaintiff's motion for judgment on the pleadings is DENIED and the Commissioner's cross-motion for judgment on the pleadings is GRANTED.

The Clerk of Court of Court is directed to close the motions at ECF Nos. 12 and 15, and to terminate this action.

SO ORDERED:

Dated:      New York, New York
            July 31, 2013

                              _____
                              KATHERINE B. FORREST
                              United States District Judge